Priority  X
Send      X
Enter     —
Closed    —
JS-5/JS-6 —
JS-2/JS-3 —
Scan Only —



# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

AMERICAN DENTAL ASSOCIATION,  )      CASE NO. CV 02-03853 DT (RZx)
                              )
                 Plaintiff,   )
                              )      MEMORANDUM AND ORDER
        vs.                   )      GRANTING IN PART PLAINTIFF'S
                              )      MOTION TO COMPEL FURTHER
SHAWN KHORRAMI,               )      DISCOVERY RESPONSES
                              )
                 Defendant.   )
_____)

This matter came before the Court for hearing on April 14, 2003 on Plaintiff's motion to compel further responses to discovery. Plaintiff American Dental Association (the "ADA"), a non-profit professional association for dentists, seeks an order compelling Defendant to provide further responses to several document requests and interrogatories. Defendant Khorrami opposes the motion largely on grounds of attorney-client privilege and the attorney work product doctrine. Melvin N. A. Avanzado, Esq., appeared for the ADA at the hearing. James Wheaton, Esq., appeared for Khorrami.

Although most of Plaintiff's discovery requests are inappropriate or premature, the Court will order Defendant to produce materials responsive to four proper discovery requests. Moreover, Defendant may not withhold documents or information, including even opinion work product, under the work product doctrine. The mental impressions of Defendant and other materials he considered prior to making the statements

targeted in this defamation action – which are, or may well be reflected in, his work product – are directly at issue, are unavailable elsewhere, and Plaintiff has a particularized and compelling need for them.

This Court decides only the privilege issue placed before it. It does not decide whether California's litigation privilege applies, whether the statements are opinion, whether the statements are protected by the First Amendment, or any other potentially dispositive matter.

# I.

## BACKGROUND

Defendant, Shawn Khorrami, who has served as counsel for plaintiffs in numerous actions against the ADA, published statements on his law firm's website and in press releases to the effect that the ADA, out of greed, has concealed the health dangers of using amalgam fillings, a widespread dental practice approved by the ADA. In May 2002, the ADA commenced this diversity action against Khorrami, asserting a claim of defamation under California law, citing three statements on his website. As recited in the Complaint, those three statements are as follows:

"The [Khorrami] firm has been extensively involved in litigation with the American Dental Association, and is well familiar with the ADA's practices and its efforts to conceal the dangers associated with amalgam for the financial benefit of itself and those of organized dentistry."

"The ADA has a vested financial interest in the continued use of mercury and which [sic] has exercised undue and unfair pressure on dentists not to warn their patients of the dangers of mercury."

> "When scientifically analyzed, amalgam fillings represent nothing more than a con on the U.S. population, orchestrated by the American Dental Association and its web of constituent associations and component societies . . . ."

Complaint ¶ 16(a), (b), (c); *see also* Complaint at 14 (web page containing first quoted statement), 16 (second), 18 (third).

In October 2002, before the parties had conducted discovery, Khorrami filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), asserting that his challenged statements were protected by California's statutory "litigation privilege," which bars tort liability for publication of "a true and fair report . . . of . . . a judicial proceeding, . . . or . . . anything said in the course thereof." CAL. CIVIL CODE § 47(d). In support of that motion, Khorrami submitted declarations and copious exhibits, meant to show that his three website statements fairly report on court filings and pronouncements in other cases.

Coupled with his dismissal motion, Khorrami also filed a special motion to strike the complaint pursuant to CAL. CIV. PROC. CODE § 425.16, informally known as an "anti-SLAPP" motion. In his anti-SLAPP motion, he asserted, among other arguments, that the ADA will be unable to prove the required defamation element of "actual malice,"[1]

---

[1]    In a defamation action by a public figure, the plaintiff must prove that the defendant made the defamatory statements "with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964). The test is a subjective one: "actual malice" cannot be satisfied by showing, under an objective approach, that a reasonable person in the defendant's position *would* have known the publication to be false or *would* have been recklessly disregarding its truth or falsity, *cf. Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511 n.30 (1984) (defendant must have "realized that his statement was false or . . . subjectively entertained doubts as to the truth of his statement."), although objective measures usually must serve as the only available evidence of a defendant's subjective mental state. *Cf. Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997) ("[W]e have yet to see a defendant who admits to entertaining serious doubts about the authenticity of an article it published . . . ."). Here, the ADA has assumed that it is a public figure, but it has done so solely for purposes of the pending

(continued...)

1   in part because Khorrami's statements are truthful, and in part because the evidence

2   necessary to prove Khorrami's malice is protected by privilege and the work product

3   doctrine.  In support of his anti-SLAPP motion, Khorrami filed declarations stating, in

4   substance, that everything supplying any basis for his statements about the ADA – every

5   document, every communication – was "obtained [by him] in the course of representing

6   . . . clients" in lawsuits involving the ADA.  Other than naming two experts whose reports

7   Khorrami submitted with his declarations, Khorrami did not specify further what the bases

8   for his statements about the ADA were and instead stated, in general terms, as follows:

9

10           . . . I based my statements in part on the materials I developed

11           in the course of representing my clients.  In the course of

12           representing my clients, and without waiving any privileges, I

13           have consulted experts, and read numerous scientific articles.

14           Among the studies, reports, and materials from experts and

15           health professionals that form the basis for my opinion . . . are

16           the declarations of Drs. Fritz Lorscheider and Boyd Haley and

17           the materials they reference.

18

19   *See* Decl. No. 2 of Def., filed Oct. 17, 2002, at 4.  The central dispute in this motion is

20   whether Khorrami must reveal any more details about the bases of his statements.

21        The ADA filed a motion seeking leave to conduct limited discovery to

22   support its opposition to the anti-SLAPP motion.  In doing so, the ADA tacitly

23   acknowledged that such discovery would be moot *if* the Court were to grant Khorrami's

24   dismissal motion asserting immunity under CAL. CIVIL CODE § 47.  Pl.'s Mtn. for Leave,

25   Etc., at 13-16.

26   _____

27          [1](. . .continued)

28   anti-SLAPP and dismissal motions.  *See* Pl.'s Mtn. for Leave, Etc., filed Oct. 28, 2002, at 13; Pl.'s Supp. Mem., filed Mar. 31, 2003, at 1 n.1.

At a November 18, 2002 hearing before District Judge Tevrizian, both parties "suggest[ed]" that the most efficient and proper course would be for the Court first to decide the litigation-privilege-based dismissal motion, which required no discovery, before proceeding to the anti-SLAPP motion, which, Judge Tevrizian noted, did require some prior discovery. *See* Hr'g Tr. lodged Apr. 14, 2003, at 2-3, 4-5, 7, 14-15. The Court declined to follow such a course. Judge Tevrizian granted the ADA's motion for actual malice discovery, however, and stayed further consideration of Khorrami's dismissal and anti-SLAPP motions until that limited discovery was completed. *See* Order of November 18, 2002, at 11-12.

The ADA served written discovery requests on Khorrami by mail on November 26, 2002. Khorrami mailed his responses on December 31, 2002, one day after the 30-day deadline of FED. R. CIV. P. 33 and 34, as extended by three days for mail service under FED. R. CIV. P. 6(e). *See* Jt. Stip. at 16, 23-24.

On February 18, 2003, Plaintiff filed the present motion to compel Defendant to provide further responses to several document requests and interrogatories, which the parties set for hearing on April 14, 2003.

## II.

### THE DISCOVERY REQUESTS AT ISSUE

#### A.    Document Requests

The ADA seeks all documents upon which Khorrami based not only the three specified statements on his website (Document Request ("DR") 1-2, 5-6, 9-10) but also six additional statements he made in certain declarations (DR 13-18). The ADA also seeks all documents "put[ting] into doubt" Khorrami's allegedly defamatory statements (DR 19-20), expert reports and documents referring to expert opinions (DR 21-22) and documents relating to Khorrami's communications with the media (DR 23-24, 26). As to most of these targeted subjects, the ADA separately requests (1) documents Khorrami possessed

1 | *before* he published the challenged statements, *see, e.g.*, DR 1, and (2) documents
2 | Khorrami obtained *after* his initial publication. *See, e.g.*, DR 2.

4 | **B.**   **Interrogatories**

5 | Through interrogatories, the ADA seeks details about the following categories
6 | of information:

7 | • all persons whom Khorrami told, and all publications in which he stated, the
8 | substance of each of the three statements published on his website (*see*
9 | Interrogatories ("I") 1-2, 5-6, 9-10);

10 | • all communications "put[ting] into doubt" each of those three challenged
11 | statements (*see* I 3, 7, 11), and the date on which Khorrami obtained those
12 | communications (*see* I 4, 8, 12); and

13 | • all contacts between Khorrami and the media (*see* I 13-14).

14 | As discussed below, most of these requests are improper at this time because
15 | they go beyond the confines of the actual malice issue. Eight of the remaining requests,
16 | however, are clearly relevant to that issue, but four of those are vague. In responding to
17 | the remaining four requests, Khorrami has asserted work product protection and the
18 | attorney-client privilege, but he fails to provide any privilege log or otherwise to provide
19 | any accounting of what materials are being withheld or any evidence demonstrating the
20 | applicability of any privilege to any materials.

## III.

### MOST OF THE ADA'S REQUESTS STRAY BEYOND "ACTUAL MALICE"

24 | The District Judge's November 18, 2002 Order confines the ADA's discovery
25 | at this stage to the issue of Khorrami's alleged actual malice. As discussed below, most
26 | of the requests target information beyond that narrow scope.

**A.    Documents Relating To Statements Not Alleged To Be Defamatory**

Document Requests 13 through 18 concern statements other than those over which Plaintiff has filed suit.  Whether or not they lie outside the scope of FED. R. CIV. P. 26(b)(1), and thus might be suitable for general discovery, they do not pertain to Khorrami's alleged actual malice in publishing the three targeted statements on his website.  Therefore, the motion to compel is DENIED as to Document Request Nos. 13, 14, 15, 16, 17 and 18.

**B.    Information Khorrami Obtained After His Initial Internet Publication**

Because statements like Khorrami's, made on Internet websites and not substantially changed thereafter, are more properly viewed as "single publications" under the single publication rule than as a series of discrete publications, the Court will deny the ADA's motion to compel Khorrami to provide further responses about ADA- and amalgam-related information he obtained after his initial Internet publication.

The distinction between single and multiple publications is critical.  On the one hand, events occurring after an allegedly defamatory publication have "no probative value" in showing actual malice at the time of that publication.  *See Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 55 (1971).  Thus, if the Court construes Khorrami's Internet statements as a single publication, then discovery of what he reviewed thereafter is irrelevant to actual malice.

On the other hand, if (a) an allegedly defamatory story is issued in multiple discrete editions of a publication; (b) the publisher learns new information between editions that makes him substantially doubt the accuracy of the story; and (c) the publisher nevertheless publishes the story anew, then actual malice may be found for the editions published thereafter.  *See Airlie Found., Inc. v. Evening Star Newspaper Co.*, 337 F. Supp. 421 (D.D.C. 1972).  In *Airlie*, the plaintiff foundation, which operated a conference facility in Virginia, sued the Evening Star newspaper after it published that the Airlie facility was covertly financed by the Central Intelligence Agency and other government agencies.  The

story included the statement that "the CIA declined to comment on the charges . . . ." During the evening after the Evening Star first published this allegedly defamatory story, the paper's editor had a telephone conversation with the head of the CIA, whose emphatic denial of the story left the editor "considerably shaken as to [his] original impression [of] the validity" of the story.   Nevertheless, the next day, the Evening Star published essentially the same story, including the statement that the CIA refused to comment.  *Id.* at 427-28.  Based on this evidence presented to the jury, the *Airlie* court denied the newspaper's motion for a judgment notwithstanding the resulting plaintiff's verdict.  *Id.* at 428.  Here, if Khorrami's Internet publication is viewed as a series of publications that he readily could have changed at any time, then the ADA should not be barred from discovery about what he learned after his *initial* publication of the questioned statements.

### 1.     The Single Publication Rule

Before the advent of mass media capable of reaching hundreds of thousands of readers within hours, and when "publishing" a document instead meant writing it by hand or by printing it by means of slow, low volume printing presses, courts at common law followed the "multiple publication rule" of *Duke of Brunswick v. Harmer*, 14 Q.B. 185, 117 Eng. Rep. 57 (1849).  Under this rule, a defamatory statement was deemed to be "published" anew each time it was delivered to any new reader.  The First Restatement of Torts accepted that rule.  RESTATEMENT (FIRST) OF TORTS: LIABILITY OF REPUBLISHER § 578 comment b (1938).  Courts began to recognize in the mid-20th century, however, that the multiple publication rule worked poorly in mass-media settings, having "had its origin in an era which long antedated the modern process of mass publication and nationwide distribution of printed information.  That rule also gave scant heed to the public policy which underlies statutes of limitation, . . . to outlaw stale claims." *Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 81 N.E. 2d 45, 47 (1948).  "The result of the former rule," as a California court observed, "was to grant a litigant claiming to have been libeled, countless separate causes of action, together with virtual immunity from the bar of any

1    statute of limitations." *Belli v. Roberts Brothers Furs*, 240 Cal. App. 2d 284, 288, 49 Cal.

2    Rptr. 625, 628 (1961).

3            Accordingly, the *Gregoire* court adopted the "single publication rule" as a

4    significant exception to the old rule, providing that:

5

6            the publication of a defamatory statement in a single issue of a

7            newspaper, or a single issue of a magazine, although such

8            publication consists of thousands of copies widely distributed,

9            is, in legal effect, one publication which gives rise to one cause

10           of action and that the applicable Statute of Limitation[s] runs

11           from the date of that publication.

12

13   298 N.Y. at 123, 81 N.E. 2d at 45.  Nearly all states, including California, have adopted

14   the single publication rule, as has the Second Restatement of Torts.  *See* CAL. CIV. CODE

15   §§ 3425.1 - 3425.5; RESTATEMENT (SECOND) OF TORTS § 577A (1977) (comments

16   indicating, with citations, that "the great majority of the states" now follow the single

17   publication rule).  Even under the single publication rule, however, a "republication" will

18   occur – and thereby refresh the limitations period – whenever the publisher issues a

19   separate publication from the original one that, although still allegedly defamatory, is not

20   merely a delayed circulation of the original edition.  *Id.* § 577A comment d.

21

22           **2.      The Single Publication Rule Governs Static Internet Publications**

23           The clear trend in the law is to view an Internet-published statement as a

24   single publication, at least where it is not substantially changed after its initial appearance.

25   In *Van Buskirk v. New York Times Co.*, 325 F.3d 87(2d Cir. 2003), for example, plaintiff

26   Van Buskirk sued the writer of an allegedly defamatory letter that had been posted on an

27   Internet site.  Van Buskirk did not file suit within one year of the letter's debut on the

28   Internet, as ordinarily would be required under New York's statute of limitations for libel.

1   For this reason, the Southern District of New York dismissed the action as untimely,

2   predicting that New York's highest state court, the Court of Appeals, would apply the

3   state's single publication rule to Internet postings.   In 2002, while Van Buskirk's appeal

4   to the Second Circuit was pending, the state Court of Appeals ruled that, indeed, the single

5   publication rule applied to Internet publications, and that no republication occurred when

6   the defendant updated a website with an unrelated report. *Firth v. New York*, 747 N.Y.S.

7   2d 69, 71-72, 775 N.E. 2d 463 (2002).   The Second Circuit held that it was bound to

8   follow *Firth* and thus affirmed without any substantial discussion of the underlying policy

9   arguments. *See Van Buskirk*, 325 F.3d at 89-90.

10         No court in the Ninth Circuit has addressed this issue, and the only other court

11   to have issued a published opinion expressly followed *Firth*. *See Mitan v. Davis*, 243 F.

12   Supp. 2d 719, 722 (W.D. Ky. 2003); *see also* Lori A. Wood, *Cyber-Defamation and the*

13   *Single Publication Rule*, 81 B.U. L. REV. 895 (2001) (collecting cases and concluding that

14   the developing trend, to apply the single publication rule to the Internet, is wise).

15         None of these cases discussed whether the single publication rule should

16   apply to Internet statements for purposes of actual malice, as opposed to purposes of the

17   statute of limitations.   Nonetheless, the Court can see no justification for applying the rule

18   to claims of Internet defamation for statute-of-limitations purposes but not other purposes.

19         Here, faced with the Second Circuit's decision in *Van Buskirk* and the lack

20   of contrary published authority, other than a solitary casenote, *see* Odelia Braun, *Internet*

21   *Publications and Defamation: Why the Single Publication Rule Should Not Apply*, 32

22   GOLDEN GATE U. L. REV. 325 (2002), the Court concludes that the single publication rule

23   applies to Khorrami's statements on his professional website.   If Khorrami had

24   significantly altered the statements after first posting them, then his mental state at the time

25   of the altered republication might have been relevant for purposes of the anti-SLAPP

26   motion. But the ADA has not alleged that the website's three challenged statements have

27   changed since their initial appearance.   Under the single publication rule, Khorrami only

28

1 published the challenged statements once, and his mental state thereafter has no bearing
2 on whether the publication occurred with actual malice.

3       Accordingly, the Court DENIES the motion to compel further responses to
4 Document Request Nos. 2, 6, 10, 20 and 22.  Also, because the Joint Stipulation as to
5 Interrogatory Nos. 4, 8 and 12 recites that Khorrami has agreed to provide information "as
6 to whether the responsive documents came into Khorrami's possession . . . before or after
7 a certain date – such as the date of [initial] publication on Khorrami's website," Jt. Stip.
8 at 65, the Court DENIES the motion as to Interrogatory Nos. 4, 8 and 12.

9

10     **C.**    **Third Parties To Whom Khorrami Made His ADA-Related Statements**
11       Eleven of the ADA's remaining discovery requests seek documents relating
12 to Khorrami's contacts with the media and other third parties.  *See* DR Nos. 23, 24, 26; I
13 Nos. 1, 2, 5, 6, 9, 10, 13, 14.  In support of its motion as to these requests, the ADA
14 essentially asserts that it needs to know every person and medium to whom or to which
15 Khorrami told his allegedly defamatory tales, because each such instance might have
16 constituted, or might have led to, an additional "publication" of the allegedly defamatory
17 statements appearing on Khorrami's website.  *See* Jt. Stip. as to DR Nos. 23, 24, 26 and
18 I Nos. 13, 14 ("seeks to elicit information regarding the places of publication of
19 Khorrami's three specific defamatory statements"); Jt. Stip. as to I Nos. 1, 2, 5, 6, 9, 10
20 (information needed "to establish a foundation (*i.e.*, to whom Khorrami published the
21 allegedly defamatory statements at issue), so that the ADA may then proceed to establish
22 that such statements were made with actual malice").  Khorrami objects that these requests
23 go beyond the scope of actual malice.  The Court agrees.

24       The only act of publication alleged in the Complaint is Khorrami's Internet
25 posting of the three statements critical of the ADA.  Although it is possible that other acts
26 of publication exist, the 2000 amendment to Rule 26(b)(1) "signals to the parties that they
27 have no entitlement to discovery to develop new claims . . . that are not already identified
28 in the pleadings."  FED. R. CIV. P. 26(b)(1) Advisory Committee's Note to 2000

1  amendment. The ADA thus may only seek actual malice discovery as to Khorrami's initial
2  publication of the three statements on his website.   The Court therefore DENIES the
3  motion as to Document Request Nos. 23, 24 and 26 and Interrogatory Nos. 1, 2, 5, 6, 9,
4  10, 13 and 14.

5

6                                          **IV.**

7       **MATERIALS THAT "PUT INTO DOUBT" KHORRAMI'S STATEMENTS**

8               Four of the ADA's remaining discovery requests seek documents or
9  communications "which put into doubt or question the accuracy or truth of" each of
10 Khorrami's three challenged website statements.   *See* DR No. 19; I Nos. 3, 7, 11.
11 Khorrami objects, asserting, among other arguments, that these requests are "vague,
12 ambiguous and unintelligible."  This is a close call, for the requests unquestionably seek
13 material directly relevant to actual malice, but the Court largely agrees with Khorrami.

14              Although the requests are not unintelligible, they are vague:  different people
15 may reach different, reasonable conclusions about whether a given document does or does
16 not "put into doubt or question the accuracy of" Khorrami's three challenged statements.
17 It would be difficult for even the most cooperative of litigants to be confident that he or
18 she has complied this sort of request.  Accordingly, the Court DENIES the motion as to
19 Document Request No. 19 and Interrogatory Nos. 3, 7 and 11.

20

21                                          **V.**

22      **IN RESPONSE TO THE REMAINING REQUESTS, KHORRAMI MUST**
23       **PRODUCE DOCUMENTS OR A PRIVILEGE LOG – BUT MAY NOT**
24      **WITHHOLD MATERIALS UNDER THE WORK PRODUCT DOCTRINE**

25              Four discovery requests remain.  Document Request Nos. 1, 5 and 9 seek all
26 pre-publication documents upon which Khorrami based his first, second and third Internet-
27 published statements about the ADA.  Document Request No. 21 seeks all pre-publication
28 documents containing or referring to expert opinion.  The Court will grant the ADA's

                                          12

1    motion as to these core actual malice requests and compel Khorrami to produce documents

2    or a privilege log responsive to these requests – without withholding any materials or

3    information based on the work product doctrine.

4

5    **A.    Applicable Law**

6           Litigants in federal court generally may obtain discovery of "any matter, not

7    privileged, that is relevant to the claim or defense of any party, including the existence,

8    description, nature, custody, condition, and location of any books, documents, or other

9    tangible things and the identity and location of persons having knowledge of any

10   discoverable matter." FED. R. CIV. P. 26(b)(1).   Accordingly, the basic issues in a

11   discovery dispute boil down to relevance and privilege, as discussed below.

12

13   **1.    Relevance, at this Juncture, is Restricted to Actual Malice**

14          In Section III above, the Court already has weeded out those requests seeking

15   material insufficiently focused on Khorrami's pre-publication actual malice.

16

17   **2.    Attorney-Client Communications Privilege**

18          The purpose of the centuries-old attorney-client privilege is "to promote full

19   and open discussion of the facts and tactics surrounding individual legal matters. . . . [so

20   that the client] may have adequate advice and a proper defense.'" *Mitchell v. Superior*

21   *Court*, 37 Cal. 3d 591, 599, 208 Cal. Rptr. 886, 890 (1984) (citations omitted); *see*

22   *generally Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (tracing history of the

23   privilege) (*citing* 8 J. Wigmore, EVIDENCE § 2290 (McNaughton rev. 1961)). "If a lawyer

24   could not promise to maintain the confidentiality of his [or her] client's secrets, the only

25   advice he or she could provide would be, 'Don't talk to me.'" *Southern California Gas Co.*

26   *v. Public Util. Comm'n*, 50 Cal. 3d 31, 37, 265 Cal. Rptr. 801, 803-04 (1990).

27          The privilege is absolute – that is, it cannot be overridden upon a showing

28   that an opposing party needs the privileged information and cannot obtain it elsewhere –

1    and hence may result, on occasion, in unjust decisions; but the public policy determination

2    underlying the privilege is that its benefits outweigh such burdens. *Id.*; *see*

3    *generally* Charles Alan Wright & Kenneth W. Graham, Jr., 24 FED. PRAC. & PROC.,

4    EVIDENCE § 5472 (1986).

5

6              **a.**     **Choice of Law:  California**

7          FED. R. EVID. 501 provides that, "in civil actions and proceedings, with

8    respect to an element of a claim or defense as to which State law supplies the rule of

9    decision, the privilege of a witness . . . shall be determined in accordance with State law."

10    Here, state law supplies the rule of decision for the ADA's only claim, defamation.

11    Accordingly, California law applies as to the existence and boundaries of the attorney

12    client privilege in this case.

13

14              **b.**     **Summary of California Law of Attorney-Client Privilege**

15          California has codified the privilege at CAL. EVID. CODE § 950 *et seq.*  The

16    privilege shields from disclosure "confidential communications between client and

17    lawyer," defined as "information transmitted between a client and his or her lawyer in the

18    course of that relationship and in confidence . . . ."  CAL. EVID. CODE §§ 952, 954.

19    Although the client, not the attorney, "holds" the privilege, *see* CAL. EVID. CODE § 953,

20    the lawyer nevertheless is authorized to assert and, indeed, is *required* to assert the

21    privilege on the client's behalf.  *See* CAL. EVID. CODE §§ 954(c), 955.

22          As discussed in Section V.D below, the party claiming the privilege bears the

23    initial burden of demonstrating that otherwise responsive information is covered by the

24    privilege.

25

26            **3.**     **Work Product Doctrine**

27          The work product doctrine provides qualified protection against the discovery

28    of trial preparation materials that "reveal an attorney's strategy, intended lines of proof,

1 evaluation of strengths and weaknesses, and inferences drawn from interviews." *Hickman*

2 *v. Taylor*, 329 U.S. 495, 511 (1947).  Its purpose is to prevent attorneys from obtaining an

3 unfair advantage "on wits borrowed from the adversary."  *Id.* at 516 (Jackson, J.,

4 concurring).

5

6                              **a.    Choice of Law:  Federal**

7              The parties devote substantial portions of the Joint Stipulation to arguing over

8 which law applies to work product protection, with Khorrami asserting that California law

9 applies due to FED. R. EVID. 501 and the ADA asserting that federal law governs.  The

10 choice is significant, for under California law, work product reflecting an attorney's

11 opinions enjoys an absolute privilege, *see* CAL. CIV. PROC. CODE § 2018(c), whereas,

12 under federal law as applied in this Circuit, even such "opinion work product" ultimately

13 may be discoverable.

14              The ADA is correct.  As the Third Circuit has explained:

15

16                    Unlike the attorney-client privilege, the work product

17              privilege is governed, even in diversity cases, by a uniform

18              federal standard embodied in FED. R. CIV. P. 26(b)(3), which

19              essentially codifies the rule of *Hickman* . . . .

20

21 *United Coal Cos. v. Powell Const. Co.*, 839 F.2d 958, 966 (3d Cir. 1988); *see also*

22 *PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP*, 305 F.3d 813, 817 (8th Cir. 2002) (similar);

23 *Baker v. General Motors Corp.*, 209 F.3d 1051, 1053 (8th Cir. 2000) (similar); *Federal*

24 *Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland*, 196 F.R.D. 375, 381 (S.D. Cal.

25 2000) (*quoting and following United Coal*).

26              Two rationales have been advanced for applying the federal work-product

27 doctrine instead of analogous state principles.  First, while this Court and others often refer

28 to the doctrine as a "privilege" for the sake of convenience, the doctrine is not a

1 *substantive* "privilege of a witness," *see* FED. R. EVID. 501, like the attorney-client
2 communications privilege, but rather a qualified procedural immunity which protects
3 information and items from discovery in certain circumstances – and which, unlike the
4 attorney-client privilege, can be pierced, at least in part, upon a proper showing of need.
5 *Cf. Admiral Ins. Co. v. United States Dist. Court for the Dist. of Arizona (King Ranch*
6 *Properties LP)*, 881 F.2d 1486, 1494 (9th Cir. 1988) (holding that it was error for district
7 court to compel the discovery of attorney-client privileged matter, even though party
8 seeking discovery demonstrated that information was unavailable elsewhere). Second, the
9 very fact that there is a federal rule defining work product protection means that state
10 versions must yield to the federal one, even if the doctrine otherwise could be viewed as
11 a privilege under FED. R. EVID. 501. *See* William W. Schwarzer, A. Wallace Tashima &
12 James M. Wagstaffe, CALIFORNIA PRACTICE GUIDE: CIV. PROC. BEFORE TRIAL ¶ 1:62.11
13 (2001) (*citing Baker v. General Motors, supra*).

14

15         **b.**     **What the Doctrine Protects: "Trial Preparation Materials"**
16      Federal Rule of Civil Procedure 26(b)(3) reads as follows:

17

18         **Trial Preparation: Materials.** Subject to the provisions
19      of subdivision (b)(4) of this rule, a party may obtain discovery
20      of documents and tangible things otherwise discoverable under
21      subdivision (b)(1) of this rule and prepared in anticipation of
22      litigation or for trial by or for another party or by or for that
23      other party's representative (including the other party's attorney,
24      consultant, surety, indemnitor, insurer, or agent) only upon a
25      showing that the party seeking discovery has substantial need of
26      the materials in the preparation of the party's case and that the
27      party is unable without undue hardship to obtain the substantial
28      equivalent of the materials by other means.   In ordering

16

1       discovery of such materials when the required showing has been

2       made, the court shall protect against disclosure of the mental

3       impressions, conclusions, opinions, or legal theories of an

4       attorney or other representative of a party concerning the

5       litigation.

6

7  FED. R. CIV. P. 26(b)(3).

8

9           **c.**     **Materials Prepared In Other Cases Also Are Protected**

10       Rule 26(b)(3) is silent as to whether it protects documents and materials

11  created in anticipation of litigation other than in the case in which the discovery is being

12  sought. Federal courts, however, consistently have honored such "prior litigation" work

13  product protection, at least when the current case is closely related to the case for which

14  the targeted materials were prepared. *See Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d

15  726 (8th Cir. 2002) (according protection apparently without regard for whether cases

16  were related); *Frontier Refining Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695 (10th Cir.

17  1998); *see also Federal Trade Comm'n v. Grolier Inc.*, 462 U.S. 19, 25-27 (holding that,

18  under the *combined* authority of Rule 26(b)(3) and a statutory exemption to the Freedom

19  of Information Act, work product protection persists "without regard to the status of the

20  litigation for which it was prepared," so long as the material was prepared "by or for a

21  party to the instant litigation"), 27 & n.8 (citing cases demonstrating that, as of 1983, all

22  of the five Circuit Courts of Appeals that had decided the issue had accorded work product

23  protection to materials sought in subsequent litigation); *id.* at 28-35 (Brennan, J.,

24  concurring) (arguing that the *Grolier* majority should have based its ruling solely on Rule

25  26(b)(3)). Here, this case and Khorrami's other cases involving dental amalgam and the

26  ADA are closely related. Accordingly, work product arising in Khorrami's prior cases will

27  be similarly protected as work product in this case.

28

#### d.   The Work Product Doctrine's Protection Is Not Absolute

Unlike a true privilege, the work product doctrine provides only a qualified immunity from discovery. As the Rule codifying the doctrine itself indicates, even after a party resisting discovery has met its initial burden of showing that material is protected, the material nevertheless must be disclosed "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

The final sentence of Rule 26(b)(3) requires the court, "[i]n ordering discovery of such materials when the required showing has been made," to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." In effect, this requires courts to distinguish "opinion work product," which is subject to an extra layer of protection, from "ordinary work product." But is the protection for opinion work product absolute? In the Ninth Circuit, it is not.

In *Upjohn Co. v. United States*, 449 U.S. 383 (1981), the Supreme Court expressly declined to decide whether the final sentence of Rule 26(b)(3) provides *absolute* protection for opinion work product, concluding only that, in the case before it, a "far stronger showing of necessity and unavailability by other means" would have been required to compel disclosure. *Id.* at 402. The Circuit Courts of Appeals are split on this question, *see generally* John F. Wagner, Jr., *Protection from Discovery of Attorney's Opinion Work Product Under Rule 26(b)(3)*, 84 A.L.R. FED. 779 (1987), with the Ninth Circuit squarely in the camp permitting discovery. In *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573 (9th Cir. 1992), the court held that opinion work product "may be discovered and admitted when mental impressions are *at issue* in a case and the need for the material is compelling," cautioning that such determinations must be made on a case-by-case basis. 976 F.2d at 576-77 (emphasis in original); *see also United States* ex rel.

1  *Bagley v. TRW, Inc.*, 212 F.R.D. 554, 559 (C.D. Cal. 2003) ("rare and extraordinary

2  circumstances" justify discovery of opinion work product).

3

4         **4.**     **Initial Burden On Claimant To Establish That Protection Applies**

5         The initial burden rests on the party asserting a privilege (including work

6  product protection) to show how the material withheld fits within that privilege. *See* FED.

7  R. CIV. P. 26(b)(5); *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065, 1069

8  (N.D. Cal. 2002) (*citing Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 266 (10th Cir.

9  1995)).[2] A party cannot carry this burden by mere *ipse dixit* assertions that the privilege

10  applies and, instead, must provide more substantial proof of eligibility for the privilege.

11  *See Federal Deposit Ins. Corp. v. United Pac. Ins. Co.*, 152 F.3d 1266, 1276 n.6 (10th Cir.

12  1998) (*citing Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985) (affirming district

13  court's refusal to quash subpoena for deposition of attorney for defendant, because

14  defendant failed to do more than merely assert that deposition would intrude into

15  privileged subjects)); *United States v. Construction Products Research, Inc.*, 73 F.3d 464,

16  473 (2d Cir. 1995).

17         To satisfy this initial burden, the party asserting a privilege must comply with

18  FED. R. CIV. P. 26(b)(5):

19

20         **Claims of Privilege or Protection of Trial Preparation**

21         **Materials.**  When a party withholds information otherwise

22         discoverable under these rules by claiming that it is privileged

23         or subject to protection as trial protection material, the party

24         shall make the claim expressly and shall describe the nature of

25         the documents, communications, or things not produced or

26  _____

27      [2]   Although federal procedural rules govern this case, this initial burden is

substantially identical under California law. *See State Farm Fire & Cas. Co. v. Superior Court,*

28  54 Cal. App. 4th 625, 639, 62 Cal. Rptr. 2d 834, 843 (1997).

1   disclosed in a manner that, without revealing information itself

2   privileged or protected, will enable other parties to assess the

3   applicability of the privilege or protection.

4

5   FED. R. CIV. P. 26(b)(5); *see also* FED. R. CIV. P. 33(b)(4) (requiring that objections to

6   interrogatories be "stated with specificity"); FED. R. CIV. P. 34(b) (requiring responses to

7   document requests "specify" which portions of request are objectionable).

8   　　　The most common means of complying with the Rule is by submitting a

9   privilege log.  A court "may require an adequately detailed privilege log in conjunction

10  with evidentiary submissions to fill any factual gaps." *Construction Products Research,*

11  *supra,* 73 F.3d at 473 (*citing In re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th Cir.

12  1992)).  An "adequately detailed" privilege log format, according to this District Court,

13  appears in a leading California practice manual:

14

15  　　　The Court finds that Model Form 11:A, set forth in The

16  　　　Rutter Group Practice Guide, FEDERAL CIVIL PROCEDURE

17  　　　BEFORE TRIAL, correctly and adequately lists all the information

18  　　　that should be set forth on the privilege log, including the title

19  　　　or position of the author and recipient of the document.[13]  In

20  　　　addition to the information on Model Form 11:A, the Court will

21  　　　require that the Bates number of the document be placed in

22  　　　parenthesis next to the log number.  This should assist a party

23  　　　in determining whether a document has been withheld without

24  　　　proper reason.

25

26  [13]　Despite arguing that it is a burden to provide this
          information, the defendants have not shown by
27        declaration or other evidence that it would, in fact,
          impose a burden on them to identify the title or position

28

1              of the author and recipient of a document listed on the
2              privilege log.

3    *O'Connor v. Boeing North Am., Inc.*, 185 F.R.D. 272, 280 (C.D. Cal. 1999) (citations
4    omitted).

5

6              **5.    Implied Waiver For Insufficient Objections Or Disclosure**

7              Privileges, including work product protection, may be deemed waived in at
8    least three situations:  untimely assertion; inadequate assertion; and selective disclosure
9    of portions of the privileged material.

10

11             **a.    Failure to Object in Time**

12             Waiver may occur when a party fails to assert the privilege in a *timely*
13   response to discovery requests, unless good cause is shown for the tardiness. FED. R. CIV.
14   P. 33(b)(4) (interrogatories); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d
15   1468, 1473 (9th Cir. 1992) (document requests pursuant to FED. R. CIV. P. 34); *accord*,
16   CAL. CIV. PROC. CODE §§ 2030(k), 2031(l).

17

18             **b.    Failure to Support an Assertion of Privilege Adequately**

19             Waiver also may occur when a party fails to provide adequate descriptive and
20   evidentiary support for an asserted privilege, as required by Rule 26(b)(5) and, as a general
21   rule, for each withheld document or item of information.  *See Clarke v. American*
22   *Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992) (affirming district court order
23   requiring party raising "blanket assertions of . . . privilege" instead "to provide a line-by-
24   line justification for each requested redaction," establishing "how the information
25   [withheld] fits within the privilege"); *see also Construction Products Research, supra*, 73
26   F.3d at 473 (claim of privilege may be rejected where claimant provides deficient privilege
27   log); *see generally Eureka Financial Corp. v. Hartford Accident and Indemnity Co.*, 136
28   F.R.D. 179, 182 (E.D. Cal. 1991) (it "should no longer be 'news' to a responding party"

that "blanket objections," including an unspecified assertion of privilege "within an individual discovery response," are improper and constitute a waiver) (collecting cases).

### c.    Disclosure of Selected Portions, Especially in Testimony

Third, by disclosing selected portions of privileged or protected material, and particularly by doing so in testimony, a party impliedly waives the privilege as to all other materials on the same subject. A Supreme Court case originating in this very district illustrates this principle. *United States v. Nobles*, 422 U.S. 225 (1975), reviewed Robert Nobles' conviction for bank robbery in the Central District of California. Because the sole significant evidence tying Nobles to the crime was the testimony of two eyewitnesses, Nobles' defense focused on discrediting those witnesses. Prior to trial, an investigator for the defense interviewed both witnesses and prepared a written report preserving the gist of his conversations. *Id.* at 227.

At trial, after the witnesses testified for the prosecution, Nobles' lawyer relied on the investigator's report in cross-examining them. The attorney asked the first witness, one of the bank's tellers, whether he recalled telling the defense investigator that he had only seen the back of the person he identified in court as Nobles. The teller replied that he did not recall saying this. "He was allowed, despite defense counsel's initial objection, to refresh his recollection by referring to a portion of the investigator's report. The prosecutor also was allowed to see briefly the relevant portion of the report." *Id.* at 228. The teller then testified that, although the report recited that he told the investigator he had only seen the bank robber's back, the teller in fact had gotten a better look than that and maintained that Nobles was the culprit. *Id.*

In cross-examining the second witness, who acknowledged having spoken to the defense investigator, Nobles' attorney twice asked whether the witness told the investigator that "all blacks look alike" to him. On both occasions, the witness denied saying so. Again the prosecution sought access to the relevant portion of the investigator's report, and again Nobles' lawyer objected. District Judge Malcolm Lucas did not order

1   further disclosure at that time.  However, he cautioned that disclosure *would* be required

2   should the investigator take the witness stand himself to impeach the two eyewitnesses'

3   testimony, and he also undertook to examine the report *in camera* and to edit out any

4   material not relevant to the witness statements at issue.  *Id*. at 228-29.

5          After the prosecution rested, Nobles called his investigator as a defense

6   witness.  Judge Lucas reminded Nobles that he would have to provide the prosecution with

7   a copy of the report, as edited by the judge, at the end of the investigator's direct

8   examination.  Nobles' attorney stated that the defense would not produce the report,

9   however, and the judge thus ruled that the investigator could not testify about his

10  interviews with the eyewitnesses.  *Id*. at 229.  The Ninth Circuit held that this ruling,

11  although a "very limited and seemingly judicious restriction," was reversible error

12  because, among other reasons, it improperly intruded into the work product of Nobles'

13  investigator.  501 F.2d 146, 156-57 (9th Cir. 1974).

14         The Supreme Court reversed on waiver grounds.   As Justice Powell

15  explained, Nobles –

16

17              sought to adduce the testimony of the investigator and contrast

18              his recollection of the contested statements with that of the

19              prosecution's witnesses.  [Nobles], by electing to present the

20              investigator as a witness, waived the privilege with respect to

21              matters covered in his testimony.[14]   [Nobles] can no more

22              advance the work-product doctrine to sustain a unilateral

23              testimonial use of work-product materials than he could elect to

24              testify in his own behalf and thereafter assert the Fifth

25  ///

26  ///

27  ///

28  ///

Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination.

---

[14]  What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances. Counsel necessarily makes use throughout trial of the notes, documents, and other materials prepared to present adequately his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver. But where, as here, counsel attempts to make a testimonial use of these materials, the normal rules of evidence come into play with respect to cross-examination and production of documents.

422 U.S. at 239-40 & n.14. Although this holding in *Nobles* applied to work product protection, the attendant *dicta* strongly indicate that the same waiver principle would apply equally to true privileges, including the attorney-client privilege.

### B.    The Requests Are Narrowly Tailored To The Actual Malice Issue

The Court now returns to the ADA's four remaining discovery requests. The materials the defendant read and the persons to whom he listened on the subject of the alleged defamation are clearly related to actual malice.

### C.    Khorrami Has Failed To Carry His Burden Of Demonstrating Privilege

As discussed above, Khorrami may not benefit from any asserted privileges until he has met his initial burden of demonstrating not only (1) that some responsive materials are privileged but also (2) specifically which materials are being withheld on that basis. "That burden is not, of course, discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965), *cited with approval in United States v. Gurtner*, 474 F.2d 297, 298 (9th Cir. 1973). Rather, the Rule states that Khorrami "*shall* describe the nature of the

1  documents, communications, or things not produced or disclosed in a manner that, without

2  revealing information itself privileged or protected, will enable other parties to assess the

3  applicability of the privilege or protection." FED. R. CIV. P. 26(b)(5) (emphasis added).

4  He has not met this burden, and his stated excuse is unpersuasive.

5       Khorrami concedes that "normally [it] would be correct" that he would have

6  to produce a privilege log and abstain from the very sort of blanket objections that he has

7  interposed, but he explains that –

8

9       in this case for Khorrami to provide a log of his research would

10       itself violate the privilege.  Understandably, having a complete

11       list of all your opponents' lawyer's studies, reports, experts,

12       consultants and knowledge of which scientific studies he has

13       and has not yet uncovered would be a tremendous advantage in

14       [the] ADA's other litigation against Khorrami's clients.  It is

15       exactly that kind of tactical advantage that the work product rule

16       was intended to foreclose. *See Williamson* [*v. Superior Court*],

17       21 Cal. 3d [829,] 834 [(1978)].

18

19  Jt. Stip at 22 n.11.  Thus, Khorrami asserts that preparing a log would be an empty gesture,

20  because, he asserts, he is entitled to withhold every part of every line on any privilege log

21  he might have prepared – apparently based on the language in the Rule, "without revealing

22  information itself privileged or protected."  As expansively interpreted by Khorrami, this

23  exception would hungrily swallow the Rule.  Although the greatest sensitivity is required

24  in cases such as this – where the defendant is an attorney representing clients in other

25  litigation against the plaintiff, heightening the risk of nuisance lawsuits – Khorrami cites

26  neither any case (including *Williamson*, in the excerpt quoted above) in which a party was

27  entirely excused from its privilege-logging obligations nor any other persuasive authority

28

1   for the course he has plotted.  As discussed further below, the Court rejects Khorrami's

2   interpretation.

3

4          **1.      Privileges Usually Do Not Protect the Identity or Existence of**

5                  **Documents or Witnesses – Unless an Attorney Selected Them**

6                  Ordinarily, a party responding to discovery may not withhold as privileged

7   the identity of witnesses who may have knowledge relevant to a dispute or documents

8   bearing on the case.  *See* FED. R. CIV. P. 26(b)(1).  Moreover, to the extent privileges do

9   apply, they generally protect only the content of a privileged document, not the fact of its

10  existence, its date, the names of the parties involved, and the general nature of document.

11  *See Clarke, supra*, 974 F.2d at 129 (attorney-client privilege generally does not protect

12  client's identity, fee amount, or general purpose of work performed); *In re Grand Jury*

13  *Witness (Salas and Waxman)*, 695 F2d 359, 361-62 (9th Cir. 1982); *United States v.*

14  *Cromer*, 483 F.2d 99, 101-02 (affirming enforcement of subpoena, issued to attorney for

15  small business, seeking testimony about amounts owed by the business and its president

16  on certain dates and the general purpose of legal work performed for them) (applying

17  Nevada law essentially identical to California's); *Condon v. Petacque,* 90 F.R.D. 53, 54

18  (N.D. Ill. 1981) ("while the 'structural framework' of the attorney-client relationship may

19  be discovered, the substance of that relationship must remain confidential"); *Hays v.*

20  *Wood*, 25 Cal. 3d 772, 785, 160 Cal. Rptr. 102, 108 (1979) (client's identity ordinarily not

21  privileged).

22                 On the other hand, the "roster" or collective identity of documents or

23  witnesses selected by an attorney in preparation for litigation may well enjoy work product

24  protection, because the choices involved – whom and what the attorney does consider

25  important, and whom or what the attorney does not – indirectly reflect the attorney's

26  thought processes. *See Sporck v. Peil*, 759 F.2d 312 (3d Cir. 1985) (holding that, although

27  it was not improper to ask defense attorney about his reliance on individual documents,

28  work product doctrine barred question seeking list of *all* documents relied upon by

counsel); *Laxalt v. McClatchy*, 116 F.R.D. 438, 443-44 (D. Nev. 1987); *Commonwealth of Massachusetts v. First Nat'l Supermarkets, Inc.*, 112 F.R.D. 149, 152-54 (D. Mass. 1986) (denying plaintiff's motion to compel list of persons interviewed by attorney as potential witnesses, but noting that plaintiff still could obtain "the names and addresses of all persons whom [sic] [defendant] knows have . . . knowledge" of the underlying claims and defenses).

### 2.    Khorrami Should Have Assembled As Complete A Log As Possible

Khorrami cannot excuse his failure to produce *any* privilege log on the "information itself privileged or protected" exception in FED. R. CIV. P. 26(b)(5), because, as noted above, ample information included in such a log is unprotected by either the attorney-client privilege or the work product doctrine.  To the extent Khorrami asserted the attorney-client privilege, he was obligated to disclose such non-privileged information – for example, the document's date, its author and known recipients (including the name of the client), a general description of the document, *e.g.*, "Letter responding to client legal inquiry," and the current location of the document – to "enable other parties to assess the applicability of the privilege or protection." *See id.*

The work product privilege presents a more mixed picture.  On the one hand, as noted above, the "roster" of documents and persons interviewed or consulted by Khorrami may enjoy work product protection.  On the other hand, that does not mean the Court should deny this motion, for two reasons.  First, Khorrami still should have produced as complete a log as possible, perhaps withholding the identities of experts and other persons consulted by Khorrami, and withholding enough information (but no more) to prevent the ADA from learning the "roster" of documents Khorrami reviewed.  But second, and much more significantly, because the ADA satisfies the difficult test for overcoming even "opinion work product" protection as discussed immediately below, the work product doctrine cannot aid Khorrami anyway – and hence there is no point in deciding the precise level of detail needed for a privilege log entry asserting the doctrine.

E.   **Opinion Work Product Must Give Way In This Rare Case**

This case is among the "rare and extraordinary" ones in which the party seeking material protected by the work product doctrine nevertheless may obtain that material, even if it includes "opinion work product."[3]  *See United States* ex rel. *Bagley v. TRW, supra,* 212 F.R.D. at 559.  In exceptional cases, the courts have permitted discovery of an attorney's opinion work product because that attorney's subjective mental state – his or her opinion about the truth or validity of a concept – was directly at issue in the action.

One such example is *Handgards, Inc. v. Johnson & Johnson*, 413 F. Supp. 926 (N.D. Cal. 1976), an antitrust suit charging that Johnson & Johnson ("J&J") had filed a series of patent actions in bad faith as part of a conspiracy to restrain trade in and monopolize the disposable glove market.  Handgards alleged that J&J repeatedly (1) acquired various patents in the disposable glove field, knowing at the time that such patents were invalid or of doubtful validity; and then (2) brought patent-enforcement actions against Handgards, despite J&J's knowledge that the patents sued upon were not valid.  *See id.* at 928.  J&J indicated it planned to call as witnesses three lawyers who had prosecuted the company's prior patent infringement suits, so that they could testify about the legal advice they rendered to J&J in connection with those cases.  J&J apparently did not contest that it had thereby waived the attorney client privilege, but it balked at turning over the attorneys' entire glove-patent litigation files on grounds of the work product doctrine.  After reviewing *Hickman, supra,* and Rule 26(b)(3), Judge Orrick reasoned that all the materials on the glove-patent subject were discoverable, including opinion work product, because they may have formed the basis for the lawyers' views:

---

[3]   Because the Court determines that the ADA satisfies the more burdensome test for obtaining "opinion work product," the Court need not analyze in depth the less burdensome test for "ordinary work product."  In brief, the Court finds that the ADA has demonstrated "substantial need" for the remaining four requests and that it is "unable without undue hardship to obtain the substantial equivalent of the materials by other means."  FED. R. CIV. P. 26(b)(3).

The principal issue in the case at bar is the good faith of the defendants in instituting and maintaining the prior patent litigation against plaintiff.  Plaintiff's success in the instant action depends upon a showing that defendants pursued the prior suits knowing they would be unsuccessful on the merits. Since the lawyers who managed and supervised the former litigation are being called as witnesses to express their opinions as to the merits of the prior suits and the validity of the underlying patents, plaintiff has a particularized and compelling need for the production of the relevant work product of these attorneys. Without discovery of the work product, plaintiff will be unable to ascertain the basis and facts upon which the opinions of these witnesses are based.  This will undoubtedly impair plaintiff's ability for effective cross-examination on a crucial issue.

. . .

[T]he plaintiff . . . can demonstrate the bad faith of the defendants only through the discovery of information in the hands of defendants and their attorneys.

*Id.* at 931 (*following Bird v. Penn Central Co.*, 61 F.R.D. 43 (E.D. Pa. 1973)).

*Holmgren, supra*, the leading Ninth Circuit case, involved a claim placing at issue the subjective mental state of the person who prepared "opinion work product." Plaintiff Julie Holmgren, having been injured by a motorist insured by State Farm, sued the insurer for bad faith in dealing with her claim.  Prior to trial, the district court compelled State Farm to produce certain adjuster memoranda, prepared in anticipation of litigation, which estimated the insurer's liability to be as high as $145,000.  The jury

1  awarded Holmgren $149,000. (The adjuster was not an attorney, but Rule 26(b)(3) draws

2  no distinction between work product of attorneys and the work product of other agents.)

3  On appeal, State Farm argued that its adjuster memos were "opinion work product" and

4  that the district court erred in compelling their production. The Ninth Circuit affirmed,

5  even though it agreed that the memos were entitled to "opinion work product" protection:

7          We agree with the several courts and commentators that

8          have concluded that opinion work product may be discovered

9          and admitted when mental impressions are *at issue* and the need

10          for the material is compelling. [Extensive citations.]

11          Both elements are met here. In a bad faith insurance

12          settlement case, the "strategy, mental impressions and opinion

13          of the [insurer's] agents concerning the handling of the claim

14          are directly at issue." *Reavis* [*v. Metropolitan Prop. & Liab.*

15          *Ins. Co.*], 117 F.R.D. [160,] 164 [(S.D. Cal. 1987)]. Further,

16          Holmgren's need for the exhibits was compelling. Montana

17          permits [actions] against an insurer for bad faith in the

18          settlement process. [Citations.]

20  976 F.2d at 577 (emphasis in original).

21        The *Holmgren* panel also made clear that opinion work product could be

22  discovered even if the party resisting discovery had *not* placed the opinion work product

23  at issue initially, whereas in *Handgards* the party resisting discovery *had* done so. *Id*. at

24  577-78 ("When an insurer chooses to remain mute on the subject [of its good or bad faith,

25  rather than assert good faith as a defense], the plaintiff is not foreclosed from developing

26  the same evidence."). *See also Dion v. Nationwide Mut. Ins. Co.*, 185 F.R.D. 288, 292-93

27  (D. Mont. 1998) (assuming that withheld insurance adjuster reports were opinion work

28  product, but compelling discovery of them anyway, because "the nature of Dion's claim

1 necessarily places the strategy, mental impressions and opinions of Nationwide's agents

2 regarding the underlying claim directly at issue"); *Kockums Inds. Ltd. v. Salem Equip.,*

3 *Inc.*, 561 F. Supp. 168, 172 (D. Or. 1983) (collecting authorities); *accord*, 4 JAMES WM.

4 MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 26.64[4] at 26-447 (2d. ed. 1983)

5 ("[W]hen the activities of counsel are inquired into because they are at issue in the action

6 before the court, there is cause for production of documents . . . ."); Charles Alan Wright,

7 Arthur R. Miller & Richard L. Marcus, 8 FED. PRAC. & PROC., CIVIL § 2026 (2d. ed.

8 1994).

9       Here, the circumstances satisfy both elements of the controlling *Holmgren*

10 test. Certainly Khorrami's subjective mental state is "at issue"; indeed, during this phase

11 of the case, while Judge Tevrizian has stayed other proceedings to permit discovery solely

12 on the question of Khorrami's actual malice, it is the *only* issue. Khorrami does not appear

13 to contest this. *See* Jt. Stip. at 7 ("[T]he discovery sought here necessarily is directed at

14 a sole issue in this case: what did Khorrami know, think, believe, read and hear about a

15 scientific controversy prior to making the complained-of statements?").

16       Second, the ADA's need for such materials is particularized and compelling,

17 and it cannot be satisfied by resort to other discovery targets. This compelling need is

18 further amplified by Khorrami's sworn declarations submitted as evidence of his *lack* of

19 malice, citing his review of an array of unspecified sources and documents – from which

20 he has named two experts – as the bases for his three Internet statements. Similar to the

21 situation in *Handgards, supra*, "[w]ithout discovery of the work product, plaintiff will be

22 unable to ascertain the basis and facts upon which [Khorrami's Internet publications, and

23 declaration testimony relating to them,] are based. This will undoubtedly impair plaintiff's

24 ability for effective cross-examination on a crucial issue. [¶] [T]he plaintiff . . . can

25 demonstrate the bad faith of the defendant[] only through the discovery of information in

26 the hands of defendant . . . ." 413 F. Supp. at 931. Also persuasive here is Justice

27 Powell's opinion in *United States v. Nobles, supra*, holding that Nobles would have

28 waived work product protection for his investigator's report *if* the investigator gave

testimony, because the report formed the basis for such testimony and would be fundamental to a fair cross-examination. *See* 422 U.S. at 239-40 & n.14.

Because the Court concludes that even opinion work product must yield to the remaining discovery requests in these circumstances, Khorrami may not withhold responsive documents or materials based on the doctrine.  For the same reason, the Court need not address the open question whether Khorrami's deficient objections impliedly waived his right to assert work product protection.  But the Court cannot avoid analyzing whether he waived *other* privileges.

### F.    Attorney-Client Privilege:  Impliedly Waived?

Each of the three ways mentioned above as a possible basis for finding an implied waiver of privilege merits discussion here:  waiver through untimeliness, through insufficiently-supported objections and through Khorrami's selective disclosures.

### 1.    Khorrami's Slight Tardiness Does Not Justify Privilege Waiver

The ADA argues that Khorrami has waived any privileges because he did not respond to discovery on time.  Khorrami had 33 days to respond after the ADA's November 26, 2002 postal service of the requests, *see* FED. R. CIV. P. 6(e), 33, 34, making the deadline Monday, December 30, 2002. Khorrami was one day late. Khorrami explains that the discovery served was broader than he had anticipated, that his office staff mis-calendared the deadline, and that the ADA suffered no prejudice.

Good cause is required for the Court to excuse tardiness and thereby prevent a waiver. *See* FED. R. CIV. P. 33(b)(4); *Richmark, supra*, 959 F.2d at 1473.  Whatever good cause Khorrami has demonstrated is slight, but then so was his tardiness.  The Court declines to find that Khorrami's untimeliness, standing alone, waived his right to assert privileges.  Accordingly, the Court next examines whether he asserted them properly.

///

///

## 2.   Implied Waiver Due to Insufficient Objections

Khorrami's approach, including his refusal to produce any log or other means of assessing the applicability of attorney-client privilege,[4] gives the Court discretion to conclude that the privilege has been waived, as discussed above.  Although the question is close, the Court declines to do so.

The Court notes at the outset that, although California's substantive privilege law defines the contours of the attorney-client privilege here, Khorrami's failure to comply with *federal* procedural rules requiring an adequately supported assertion of privilege may result in its waiver, even if no waiver would result under state law.  *Cunningham v. Connecticut Mut. Life Ins.*, 845 F. Supp. 1403, 1408 (S.D. Cal. 1994).

Because waiver is a harsh sanction for failing to object properly, courts will hesitate before applying it, although they enjoy the discretion to do so in proper cases.  In *Eureka Finanical, supra*, the court held that such discretion should be guided by the specific facts of each case, both in mitigation and in aggravation.  "Minor procedural violations [and] good faith attempts at compliance . . . militate against finding waiver.  In contrast, evidence of foot-dragging or a cavalier attitude towards following court orders and the discovery rules supports finding waiver."  *Ritacca v. Abbott Laboratories*, 203 F.R.D. 332, 335 (N.D. Ill. 2001); *see also Eureka Financial*, 136 F.R.D. at 183-84 (distinguishing "slothful" failure at proper assertion of privilege from a "arguable" one).

Five factors, chosen to guide courts in deciding whether improperly-asserted privileges have been waived, appear in *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 332 (N.D. Cal. 1985).  Although the *Hartford* court apparently chose the factors to address whether a waiver occurred due to an inadvertent disclosure to opposing litigants, a type of waiver not at issue here, the *Eureka Financial* court later adapted the factors to analyze

---

[4]   The Court's analysis of possible waiver of the attorney-client privilege applies with at least equal force to his occasional reference to sundry other privileges, although it appears from the argument section of the Joint Stipulation that he is asserting only attorney-client privilege and work product protection.  *See* Jt. Stip. at 17-25.

1   an insufficiently supported privilege objection, as discussed further below. *See* 136 F.R.D.

2   at 184-85.  These five factors are:

3

4       1.      the reasonableness of the precautions taken to prevent inadvertent disclosure;

5       2.      the time taken to rectify the error;

6       3.      the scope of discovery;

7       4.      the extent of the disclosure; and

8       5.      the "overriding issue of fairness."

9

10   136 F.R.D. at 184.

11           The *Eureka Financial* court essentially replaced "inadvertent disclosure" with

12   "failure to do the work necessary to assert a sufficiently-supported privilege objection."

13   *Id.* Its five-point analysis of defendant Hartford's blanket, unspecified objection, based

14   on attorney client privilege, is most helpful in the instant case:

15

16           First, [defendant] Hartford has taken absolutely no precautions

17           to properly assert the privilege.  Hartford failed to research the

18           requirements for asserting the privilege in federal litigation even

19           after plaintiff filed its motion to compel.  Therefore, Hartford's

20           conduct is highly unreasonable.

21           Second, Hartford has made no attempt to timely rectify its

22           error at all.  Although Hartford's initial blanket assertion of the

23           privilege was improper, the court could have excused this

24           conduct if Hartford had taken the time to correct its error *prior*

25           *to the discovery hearing on the issue. . . .*  Moreover, Hartford

26           cited no authority for its position; it simply claimed that federal

27

28

law does not require the specific listing of each privileged document.[11]

---

> [11] During the hearing, when it finally appeared that the court was seriously considering the possibility that Hartford had waived its attorney-client privilege, counsel for Hartford requested that she be allowed to produce a log of privileged documents. The court has rejected this request in that it would set a precedent for delaying discovery. That is, a party could make an improper objection, persist in that objection until the last moment at a discovery hearing, and then, after all this delay, finally do what the law requires. . . .

Third, the scope of discovery has been narrowed by the court, in order to facilitate the filing of dispositive motions . . . . As noted above, while the specific identification of privilege documents may be time-consuming, it is the only way that the court can determine whether the privilege applies.

Fourth, the extent of Hartford's improper objection was quite broad, as Hartford asserted that all documents generated after January 22, 1986 were privileged.   Thus, Hartford's improper objection has halted discovery of anything generated after litigation began in the underlying lawsuits – a time period of nearly five years.

Finally, fairness dictates that the court find a waiver in the instant situation. Pursuant to Judge Levi's scheduling order, the parties must file dispositive motions on four specific areas by May 3, 1991[,] [and thus] the instant discovery dispute must be quickly resolved. This is a close call, and the court notes in all probability no waiver would have been found if Hartford had properly asserted its privilege by specifically identifying the documents *at least* some time prior to the hearing. However,

1               given the stringent time constraints . . . , the court is compelled

2               to find a waiver of the attorney-client and work product

3               privileges.

4

5  136 F.R.D. at 184-85.  Applied here, the first four of the five factors favor a finding of

6  waiver.  The final factor does not.

7        First, Khorrami has taken only minimal precautions to assert the privilege

8  properly.  It is plain that he could have produced a privilege log of some sort; and even if

9  such would have been too burdensome, it was incumbent upon him to demonstrate that

10  burden (and perhaps affirmatively to move for a protective order).  Second, like Hartford

11  in *Eureka Financial*, Khorrami neither made any effort to rectify his insufficient assertion

12  of privilege after the ADA demanded further responses nor cited any authority in which

13  a court excused a party so thoroughly from the initial burden of producing any privilege

14  log (or otherwise demonstrating the applicability of an asserted privilege).  Although

15  Khorrami's behavior may not have been as thoroughly unreasonable as Hartford's in

16  *Eureka Financial*, nonetheless the first two factors militate in favor of finding a waiver.

17        Third, the scope of the discovery also favors waiver, although not as strongly

18  as the first two factors do.  In one sense, the focus of the ADA's discovery is narrow, for

19  all of the materials sought bear on the ADA and dental amalgam.  In another sense,

20  however, the scope is broad, for the ADA seeks *everything* on which Khorrami bases his

21  Internet statements.  Perhaps such materials are relatively well-segregated within

22  Khorrami's offices, but perhaps they are not.  Khorrami has not demonstrated, however,

23  that the breadth of the request renders it unduly burdensome (or that it otherwise

24  contributed to his failure to provide a proper log), and the third factor thus slightly favors

25  a waiver finding.

26        Fourth, Khorrami's objection was quite broad, for he withheld *all* previously-

27  undisclosed materials forming the basis for his Internet statements as protected by

28  attorney-client privilege, work product protection, or both.  Had he provided at least some

privilege log, the delay in this case's progress likely would have been significantly reduced. This factor thus favors a finding of waiver.

Fifth is the "overriding issue of fairness," which presents a mixed picture. In favor of waiver are the facts that the ADA has had to expend substantial time and resources to obtain discovery and that Khorrami's insufficient objections have caused delay. On the other hand, at least three considerations militate against a waiver. Foremost among these is the potential harm to Khorrami's clients in other dental-amalgam-related cases (although clients, harmed by an attorney's failures to assert privileges, may have alternative remedies for any resulting harm). Also, although the delay is wasteful, it is markedly different in its consequences from the delay caused by Hartford in *Eureka Financial*, which threatened a clear-cut deadline set for the end of discovery and the filing of dispositive motions. Finally and most significantly, although Khorrami clearly should have produced a substantial privilege log in any event, nevertheless the fact that *some* log data – including opinion work product – probably could have been withheld (initially) as "information itself privileged or protected" suggests that Khorrami's position was not *frivolous*, even if it lacked clear legal authority. On balance, the fairness element favors a finding of no waiver.

In conclusion, the balance of the five factors stands roughly in equipoise. The first four factors support the Court's discretion to find an implied waiver. The fifth factor – said to be weightier, or "overriding," *see Eureka Financial*, 136 F.R.D at 184 – would support the Court's discretion in declining to do so. In the interest of justice, the Court declines to find that Khorrami's insufficient objections waived the attorney-client privilege.

### 3.   Implied Waiver by Khorrami's Selective Disclosure in Testimony

Under the doctrine of *Nobles, supra,*422 U.S. at 239-40 & n.14, it may be unfair to permit Khorrami to provide his declaration testimony supporting his absence of actual malice, *see* Decl. No. 2 of Def., filed Oct. 17, 2002, at 4, without permitting the

1  ADA discovery regarding all of the bases for his testimony, including privileged ones. As

2  Justice Powell explained, "where, as here, counsel attempts to make a testimonial use of

3  [otherwise privileged] materials, the normal rules of evidence come into play with respect

4  to cross-examination and production of documents." *Id.* at 240 n.14. Did Khorrami waive

5  the privilege by submitting his declaration testimony?  The Court declines to decide this

6  question now.

7  The Court surmises that most of what is at stake – that is, the materials which

8  are responsive to the remaining four discovery requests, but which Khorrami has withheld

9  – is work product, which the Court previously has ruled must yield in this instance. Due

10  to Khorrami's failure to produce any sort of privilege log, it is currently unclear whether

11  he is withholding any attorney-client communications or other privileged materials and,

12  if he is, the extent to which he is doing so.  Thus the Court prefers not to consider a ruling

13  that Khorrami has waived any remaining privileges under *Nobles*.

14

15  **VI.**

16  **POSSIBLE PARTIAL PROTECTION FOR OPINION WORK PRODUCT**

17  It is unclear from Rule 26(b)(3) whether Khorrami's opinion work product

18  remains entitled to some partial protection under these circumstances, *see* FED. R. CIV. P.

19  26(b)(3) ("[i]n ordering discovery of [work product] when the required showing has been

20  made, the court shall protect against disclosure of [opinion work product]"), and, if it is,

21  to just what sort of protection.  Obviously such protection cannot extend so far as

22  permitting the outright withholding of responsive materials, but reasonable measures

23  governing the dissemination and handling of such materials, once disclosed, may be the

24  subject of a protective order.  The Court leaves this matter to the parties to resolve under

25  the Federal and Local Rules.

26  ///

27  ///

28  ///

# VII.

## *IN CAMERA* REVIEW OF DOCUMENTS IS STRONGLY DISFAVORED

Too often and too readily, parties to a "privilege battle" shunt the heavy burdens involved onto the courts by seeking *in camera* review of documents, often numbering in the thousands. The Court thus reminds the parties that *in camera* review is generally disfavored. *PHE, Inc. v. Department of Justice*, 983 F.2d 248, 252 (D.C. Cir. 1993). It is a substitute neither for a party's obligation to justify its withholding of documents or other responsive material, *id.*, nor for the effective adversarial testing of the claimed privileges. *See Wiener v. Federal Bureau of Investigation*, 943 F.2d 972, 979 (9th Cir. 1991). Resort to *in camera* review is inappropriate unless and until the burdened party – either the party seeking to prove the applicability of privilege in the first place, or the party seeking to show that a withheld document is properly discoverable – has submitted detailed affidavits and other evidence narrowing the scope of review to the extent reasonably possible. *See id.; accord, United States v. Zolin*, 491 U.S. 554, 571-72 (1989) (discussing crime-fraud exception to attorney-client privilege).

# VIII.

## CONCLUSION

As Judge Orrick concluded in *Handgards, supra,* in this case "plaintiff has a particularized and compelling need for the production of the relevant work product of [Khorrami]. Without discovery of the work product, plaintiff will be unable to ascertain the basis and facts upon which the [Internet publications at issue] are based. This will undoubtedly impair plaintiff's ability for effective cross-examination on a crucial issue." 413 F. Supp. at 931. Accordingly, as discussed above, the Court GRANTS IN PART AND DENIES IN PART the ADA's motion to compel further discovery responses. Khorrami shall serve further responses to Document Request Nos. 1, 5, 9 and 21 within 30 days, and may withhold no responsive materials based on the work product doctrine, including opinion work product. To the extent that Khorrami withholds any responsive

39

1 | materials on the basis of the attorney-client privilege, he shall produce a detailed privilege

2 | log as discussed above, supported by an appropriate authenticating declaration.

3 |      The Court STAYS operation of this Order for ten days from the date below

4 | to permit the parties to seek review from the District Judge.  If either party files a timely

5 | motion for review, the stay shall continue until further order of the District Judge.

6

7 |      IT IS SO ORDERED.

8

9 | DATED:  May ____9____, 2003

10

11

12

13 |                   RALPH ZAREFSKY
           UNITED STATES MAGISTRATE JUDGE